# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ARCHKEY INTERMEDIATE HOLDINGS INC., | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 2021-0383-JTL |
| | ) | |
| VINCENT P. MONA | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff. | ) | |

## OPINION ON ACCOUNTANT TRUE-UP MECHANISM

Date Submitted: July 18, 2023
Date Decided: October 3, 2023

James D. Taylor & Gary W. Lipkin, SAUL EWING LLP, Wilmington, Delaware; Javier J. Rodriguez, SAUL EWING LLP, Miami, Florida; Jennifer L. Therrien, GREENSFELDER, HEMKER & GALE, P.C., St. Louis, Missouri; *Attorneys for Plaintiff/Counterclaim Defendant.*

Timothy R. Dudderar, Aaron R. Sims, & Abraham C. Schneider, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; *Attorneys for Defendant/Counterclaim Plaintiff.*

**LASTER, V.C.**

A fully integrated stock purchase agreement calls for an independent accountant to resolve disputes about a post-closing price adjustment. The operative provision states that the independent accountant "shall act as an arbitrator."

The purchaser has moved to compel arbitration. The seller argues that despite using the term "arbitrator," the agreement contemplates an expert determination.

Arbitration and expert determination occupy opposite ends of a spectrum of alternative dispute resolution ("ADR") possibilities. Each can be tailored to look more like the other. One well-defined point along the spectrum is a post-closing price adjustment mechanism in an acquisition agreement that refers a dispute to an independent accountant. This decision calls that procedure an Accountant True-Up Mechanism.

The prevailing practice is for an Accountant True-Up Mechanism to state that the independent accountant will act as "an expert and not as an arbitrator." Sometimes, as in this case, an Accountant True-Up Mechanism will refer to the independent accountant as an arbitrator.

Authorities on Accountant True-Up Mechanisms explain that regardless of which term is used, the mechanism operates in the same way. But the different terminology creates complications for courts because terms like "arbitrator" and "arbitration" generally trigger application of the Federal Arbitration Act ("FAA") and its associated doctrinal frameworks, including the concepts of substantive and procedural arbitrability.

To determine whether an ADR mechanism contemplates arbitration under the FAA, the Delaware Supreme Court has adopted a test that turns on the authority that the ADR mechanism grants to the decision maker. *See Terrell v. Kiromic Biopharma, Inc.*, 297 A.3d

610 (Del. 2023). The Accountant True-Up Mechanism in this case closely resembles an expert determination. Framed for purposes of *Terrell*, the provision grants a degree of authority to the independent accountant that is insufficient to trigger arbitral doctrines. The fact that the drafters used the word "arbitrator" is not dispositive. The remainder of the language and structure of the provision establishes an intent to provide for an expert determination, not an arbitration. The provision as a whole is what controls.

Because the Accountant True-Up Mechanism in the stock purchase agreement is a form of expert determination, the court must determine what disputes fall within the independent accountant's authority and address any contractual issues that are beyond the accountant's ken. Here, the court interprets what it means for the proposed final balance sheet to be prepared consistent with past practices and in accordance with generally accepted accounting principles ("GAAP"), while leaving it to the independent accountant to apply that standard. The court also interprets what it means for the proposed final balance sheet to be prepared in good faith, while again leaving it to the independent accountant to determine whether that standard was met. The court construes a contractual obligation embedded in the true-up mechanism, noting that the independent accountant must make an initial determination to trigger the contractual obligation. And the court explains that it will address a claim for breach of the implied covenant of good faith and fair dealing, but only after the independent accountant has made its determinations.

The next step is for the parties to work with the independent accountant. Proceedings in this action are stayed pending the outcome of that process.

2

# I. FACTUAL BACKGROUND

The plaintiff moved to compel arbitration. The facts are drawn from the parties' submissions and other documents of record.[1] Because the parties have taken discovery, the motion operates as a motion for summary judgment on the issue of arbitrability. *Guidotti v. Legal Helpers Debt Resol.*, 716 F.3d 764, 776 (3d Cir. 2013); *see* Jay E. Grenig, 1 *Alternative Dispute Resolution* § 25:5 (4th ed.), Westlaw (database updated Aug. 2023); Martin Domke et al., 1 *Domke on Commercial Arbitration* § 15:9, Westlaw (database updated June 2023). Consequently, all factual disputes are resolved in favor of the defendant as the non-moving party, and he receives the benefit of all reasonable inferences. *Brown v. Ocean Drilling & Expl. Co.*, 403 A.2d 1114, 1115 (Del. 1979).

## A. The Parties

In 1966, Vincent "Cap" P. Mona ("Mona" or "Seller") founded Mona Electric Group, Inc. (the "Company"). As its name implies, the Company was an electrical contractor. After starting with a single used truck and a small collection of tools, Mona built the company into a large contracting firm that performs electrical work on major commercial projects. The Company was incorporated under Maryland law and had its principal place of business in Clinton, Maryland. Mona owned all of the issued and outstanding stock in the Company.

---

[1] Citations in the form "Ex. [number]" refer to exhibits to the motion. Citations in the form "Compl. ¶ —" refer to the paragraphs of the operative complaint. Citations in the form of "Compl. Ex. [number]" refer to exhibits to the operative complaint.

ArchKey Intermediate Holdings Inc. (the "Purchaser") is a Delaware corporation with its principal place of business in St. Louis, Missouri. This case concerns the Purchaser's acquisition of the Company. At the time of the acquisition, the Purchaser was pursuing a roll-up strategy that involved buying electrical contractors across the United States and consolidating their operations. Oaktree Capital Management, a private equity firm, was backing the Purchaser's roll-up strategy.

On the surface, both the Purchaser and Mona appeared to be sophisticated parties, and each was represented by counsel. But the two sides brought dramatically different backgrounds, experiences, and expectations to the bargaining table. The Purchaser was a repeat player in the M&A game, understood the different points in the deal process when value can shift from one side to the other, and used that knowledge to its advantage. For the Purchaser, the acquisition was a one-off economic transaction in which both sides were bargaining to secure the best possible outcome for themselves and who, after signing, would exercise their contractual rights to that end. *Caveat emptor et venditor.*

Mona, on the other hand, had no experience in the M&A game. He had spent his career building a business. He had never sold a company and had no sense of the tricks and traps lurking in the deal process. His experience was with relational contracts where the counterparties establish trust, work together over a long period, and seek to resolve disputes to their mutual benefit. Mona saw the transaction as the next step in the evolution of a business he had built that would enable it to continue as part of a larger organization. For him, the headline sale price that he initially agreed to with the Purchaser embodied their

4

bargain, and he expected both sides to work together to achieve it. He did not foresee inflection points where the Purchaser could apply leverage to reallocate value.

With his eyes opened by the Purchaser's subsequent actions, Mona alleges in this litigation that that the Purchaser acted in a predatory manner. He contends that the Purchaser sought to acquire the Company as cheaply as possible, planned to strip out costs by firing employees, and intended to integrate it into a bundle of regional electrical contractors that Oaktree could sell to another private equity player. That is a pejorative but not unfair description of a roll-up strategy. The pejorative spin comes from Mona only perceiving now what was happening when the deal was struck.

## B.     The Letters of Intent

In May 2019, the Purchaser and Mona executed a letter of intent. The headline price for the Company was $19.5 million.

After signing the letter of intent, the Purchaser conducted due diligence. Clay Scharff, the Purchaser's Chief Executive Officer, and Patrick Kriegshauser, the Purchaser's Executive Vice President and Chief Financial Officer, led the effort.

In September 2019, the Purchaser and Mona entered into a second letter of intent. This time, the headline price for the Company was $22.5 million.

In fall 2019, the Purchaser identified an error in the Company's estimate for the profit from a contract with the University of Maryland Capital Region Medical Center Hospital (the "Hospital Contract"). Due diligence stopped.

To reassure the Purchaser, Mona had his team prepare a detailed assessment of the Hospital Contract, and the Company wrote down the projected profit by approximately $4 million. The Purchaser spoke with Company staff about how the error occurred.

Notwithstanding those steps, the Purchaser made noises about walking from the deal. The Purchaser suggested that a way to move forward would be to determine the value of the Hospital Contract as part of a post-closing true-up process. In January 2020, Kriegshauser gave Mona a presentation about how a post-closing true-up process could work. The presentation contained four examples. Three depicted upward price adjustments in Mona's favor, each in the magnitude of $300,000. One depicted a negative price adjustment in the Purchaser's favor of approximately $25,000.

## C.    The Stock Purchase Agreement

On February 1, 2020, the Purchaser and Mona entered into a stock purchase agreement. Compl. Ex. 1 (the "Stock Purchase Agreement" or "SPA"). The Purchaser agreed to acquire all of the stock of the Company for an initial purchase price of $21 million.

The initial purchase price was subject to an Accountant True-Up Mechanism. Sections 2.1 and 2.2 of the Stock Purchase Agreement stated that the $21 million headline purchase price was based on an estimated closing balance sheet for the Company dated as of November 30, 2019, which the Stock Purchase Agreement called the "November Balance Sheet." The final consideration that Mona received would be based on an adjusted closing balance sheet dated as of November 30, 2020, which the Stock Purchase Agreement called the "Adjusted Closing Balance Sheet." The consideration that Mona received could

6

go up or down depending on the difference between the November Balance Sheet and the Adjusted Closing Balance Sheet.

The Accountant True-Up Mechanism in the Stock Purchase Agreement appears in Section 2.6 (the "SPA Adjustment Provision"). It calls for the Purchaser to deliver the Adjusted Closing Balance Sheet to Mona. SPA § 2.6(a). It mandates that the Purchaser prepare the Adjusted Closing Balance Sheet "in good faith and in accordance with GAAP and consistent with the past practices of [the Company] and the November Balance Sheet," subject to possible adjustments for (i) "any and all investments of the Company" liquidated into "net proceeds," (ii) "prepaid expenses," (iii) "any and all Liabilities and Indebtedness," (iv) "any and all Accounts Receivable," (v) "any Retainage," (vi) "any and all Loss Contracts," (vii) markup adjustments for "each Contract set forth on the Estimated Closing WIP Schedule," (viii) "any and all 'Costs and Estimated Earnings in Excess of Billings,'" and (ix) "the financial impact of each Contract set forth on the Estimated Closing WIP Schedule on the Company." *Id.* The provision authorizes the Purchaser to take into account any "information and facts that come to light or are learned by the Purchaser or the Company during the Adjustment Period." *Id.*

The provision next gives Mona thirty days to dispute any aspect of the Adjusted Closing Balance Sheet. To raise a dispute, Mona must send what the Stock Purchase Agreement calls an "Objection Notice." *Id.* § 2.6(b). The Objection Notice must specify the amount of any proposed adjustment and the basis for it. *Id.*

The Stock Purchase Agreement provides that if Mona does not send a timely Objection Notice, then the Adjusted Closing Balance Sheet becomes final. If Mona sends

7

a timely Objection Notice, then the parties must spend ten days attempting to resolve the specified issues. *Id.* §§ 2.6(b)–(c).

The Stock Purchase Agreement states that if no resolution is reached, then any remaining disputes will be submitted to what the Stock Purchase Agreement calls the "Independent Accountant." *Id.* § 2.6(d). The Stock Purchase Agreement designates Ernst & Young LLP to serve in that role. *Id.* Ex. A at A-7. In language heavily freighted with implications for this case, the Stock Purchase Agreement states that "[t]he Independent Accountant shall act as an arbitrator." *Id.* § 2.6(d).

### D.     The Parties' Relationship Deteriorates.

The parties held a simultaneous signing and closing. After closing, the Purchaser started acting like the sole owner of the Company and not like Mona's partner. In March 2020, the Purchaser terminated the Company's longtime Chief Financial Officer, sidelined the Company's six top managers, and fired thirty office employees. The Purchaser required the Company's CEO, David McKay, to work from home and cut him out of the operational loop. The Purchaser transferred day-to-day control to David Howe, the Company's president.

Mona had not expected those changes. He cared about what had been his Company and his employees. He became suspicious about the Purchaser's motives. During the ensuing months, Mona asked for updates about how the Company was performing. The Purchaser ignored his inquiries.

On December 9, 2020, the Purchaser delivered the Adjusted Closing Balance Sheet. The adjustments lowered the purchase price to $8,375,226.59. That meant that Mona owed

the Purchaser a whopping $12,624,773.41, representing the delta between the $21 million headline price that the Purchaser paid at closing and the $8.375 million adjusted price that the Purchaser now claimed was the real price.

Mona was not prepared for that outcome. He viewed the $21 million headline price as the real price, reached after the Purchaser conducted significant due diligence. He understood that the SPA Adjustment Provision might result in minor adjustments to the purchase price, because when Kriegshauser gave him a presentation about how a post-closing adjustment process could work, the presentation depicted adjustments in the low five and six figures. No one had suggested that Mona would owe the Purchaser two-thirds of the headline price.

That shocking result seemed to confirm every suspicion that Mona had about the Purchaser. Two days after receiving the Adjusted Closing Balance Sheet, Mona's counsel objected, asserting that the Purchaser had not acted in good faith or complied with the SPA Adjustment Provision. Ex. 12. The letter asked the Purchaser to "immediately provide any and all documentation it reviewed or relied upon in making each and every adjustment reflected in the [Adjusted Closing Balance Sheet] pursuant to the parameters set forth in Section 2.6(a)(i) through (ix)." *Id.*

On December 15, 2020, the Purchaser sent Mona a breakdown of the adjustments. The Seller also provided seven supporting documents consisting of nearly 200 pages. Ex. 13. The Purchaser offered to provide additional information and agreed to extend the time in which Mona could send a formal Objection Notice until February 1, 2021.

9

By letter dated January 29, 2021, Mona's counsel identified forty-five objections to the Adjusted Closing Balance Sheet (the "January Letter"). Mona viewed the January Letter as a timely Objection Notice.

In the January Letter, Mona asked the Purchaser to assign to the Seller any assets or contract values that had been written off. Section 2.6(a) of the SPA provided that "any and all Accounts Receivable (other than undisputed Retainage, as reasonably determined by Purchaser) that are uncollected as of the end of the Adjustment Period shall be written off and, at the request of Seller, assigned by the Company to Seller." SPA § 2.6(a). Mona wanted to use his personal relationships with the counterparties to obtain better terms. At the time, Mona did not know that the Purchaser had already settled any and all claims related to the Hospital Contract, preventing Mona from attempting to resolve those disputes. The Purchaser had not included any adjustments to the Adjusted Closing Balance Sheet based on the Hospital Contract settlement.

At the same time these exchanges were taking place, Oaktree sold the Purchaser to another private equity firm. When selling the Purchaser, Oaktree reported that the Company had 2020 EBITDA of $6.683 million, shareholders' equity of $20.33 million as of October 31, 2020, and an enterprise value of $31 million. Ex. 26; Ex. 28. Yet in its communications with Mona, the Purchaser contended that the value of the Company was just over $8 million. Mona points to those facts as additional evidence of bad faith.

### E.      This Litigation

On April 30, 2021, the Purchaser filed this lawsuit. The complaint asserted a claim for breach of contract, sought the remedy of specific performance (styled as another count),

10

asserted a claim for breach of the implied covenant of good faith and fair dealing, and sought declaratory relief. Through its complaint, the Purchaser asked the court to declare that (i) the January Letter was not an Objection Notice, (ii) Mona had waived his right to challenge the Adjusted Closing Balance Sheet, and (iii) the Adjusted Closing Balance Sheet was final. The Purchaser asked for an order compelling Mona to pay the Purchaser $12,624,773.41.

The Purchaser did not ask the court to enforce the SPA Adjustment Provision by sending any disputes to the Independent Accountant. Because the Purchaser asserted that Mona had failed to file a contractually compliant Objection Notice, the Purchaser viewed that process as unnecessary. The Purchaser asserted that Section 8.11 of the Stock Purchase Agreement gives this court exclusive jurisdiction to resolve contractual disputes.

Mona answered the complaint and asserted a counterclaim. He contended that the January Letter constituted a valid Objection Notice and that even if there were defects in the Objection Notice, he had not waived his right to contest the Adjusted Closing Balance Sheet. In formal legal parlance, the counterclaim contained counts for declaratory relief, breach of contract, and breach of the implied covenant of good faith and fair dealing. The Purchaser filed a reply to the counterclaim.

After the pleadings closed, the Purchaser sought judgment on the pleadings under Rule 12(c). In the alternative, the Purchaser moved to compel arbitration by sending the disputes over the Objection Notice to the Independent Accountant.

The court denied the Purchaser's motion without prejudice. The court noted that Mona had identified problems with the preparation of the Adjusted Closing Balance Sheet

11

that raised reasonably conceivable claims, including legitimate questions about whether the Purchaser had prepared the Adjusted Closing Balance Sheet in good faith, in accordance with GAAP, and consistent with past practices. The court also noted that there were legitimate questions about the Objection Notice, including whether it sufficiently identified the matters in dispute and the adjustments that Mona believed should be made.

The court observed that the parties could engage in discovery and have a trial on the sufficiency of the Adjusted Closing Balance Sheet and Objection Notice, but doing so would be costly and inefficient. To streamline the dispute, the court directed the parties to engage in a process that would enable Mona to prepare a more detailed Objection Notice that would clearly identify the items he disputed and the adjustments that he believed should be made. Dkt. 6 at 78–81. The resulting Objection Notice would constitute the operative notice for purposes of the SPA Adjustment Provision. Dkt. 48 at ¶ 4.

After conducting discovery, Mona served what is now the operative Objection Notice. *See* Dkt. 107 Ex. A. On February 8, 2023, the Purchaser renewed its motion to compel arbitration. Dkt. 109. The Purchaser seeks to have the Independent Accountant resolve all of the disputes that Mona raised. Mona contends that the Independent Accountant is an expert, not an arbitrator. He argues that the Independent Accountant cannot determine whether the Adjusted Closing Balance Sheet was prepared in good faith and cannot resolve his other objections. He wants the entire dispute to remain in this court.

## II.    LEGAL ANALYSIS

When a party moves to dismiss a complaint in favor of arbitration, a court may apply a pleading-stage standard under Rule 12(b)(6) or Rule 12(c). *See Guidotti*, 716 F.3d at 771,

12

775 n.6. If the movant relies on documents outside the pleadings, then the court will apply the summary judgment standard under Rule 56. *Matria Healthcare, Inc. v. Coral SR LLC*, 2007 WL 763303, at *5 (Del. Ch. Mar. 1, 2007). If there are disputes of fact, then the parties may conduct discovery on the issue of arbitrability before the court makes a ruling. *Guidotti*, 716 F.3d at 776; *see* Grenig, *supra*, § 25:5. When a court rules on a motion to compel arbitration after discovery, the court applies the Rule 56 standard. Grenig, *supra*, § 25:5; Domke, *supra*, § 15:9.

Because the parties have conducted discovery, the Purchaser's renewed motion to compel arbitration operates as a motion for summary judgment on the issue of arbitrability. Under Court of Chancery Rule 56, summary judgment "shall be rendered forthwith" if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Ct. Ch. R. 56(c). The moving party bears the initial burden of demonstrating that, even with the evidence construed in the light most favorable to the non-moving party, there are no genuine issues of material fact. *Brown*, 403 A.2d at 1115. If the moving party meets this burden, then to avoid summary judgment, the non-moving party must "adduce some evidence of a dispute of material fact." *Metcap Sec. LLC v. Pearl Senior Care, Inc.*, 2009 WL 513756, at *3 (Del. Ch. Feb. 27, 2009), *aff'd*, 977 A.2d 899 (Del. 2009) (TABLE).

This case raises issues of contract interpretation. The Stock Purchase Agreement is governed by Delaware law. SPA § 8.10. Under Delaware law, "[w]hen interpreting a contract, the role of a court is to effectuate the parties' intent." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). Absent ambiguity, the court "will give

13

priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016).

"Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning." *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012). The "contract's construction should be that which would be understood by an objective, reasonable third party." *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014) (internal citation omitted). "Absent some ambiguity, Delaware courts will not destroy or twist [contract] language under the guise of construing it." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent." *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

"In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985). "[T]he meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan." *Id.* "[A] court interpreting any contractual provision . . . must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument." *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998).

"Contract language is not ambiguous merely because the parties dispute what it means. To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning." *Alta Berkeley*, 41 A.3d at 385 (footnote omitted). If the language of an agreement is ambiguous, then the court "may consider extrinsic evidence to resolve the ambiguity." *Salamone*, 106 A.3d at 374. Permissible sources of extrinsic evidence may include "overt statements and acts of the parties, the business context, prior dealings between the parties, [and] business custom and usage in the industry." *Id.* (alterations in original). A court may consider "evidence of prior agreements and communications of the parties as well as trade usage or course of dealing." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 (Del. 1997). "When the terms of an agreement are ambiguous, 'any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.'" *Sun-Times Media Gp., Inc. v. Black*, 954 A.2d 380, 398 (Del. Ch. 2008) (quoting Restatement (Second) of Contracts § 202 (Am. L. Inst. 1981)). "[T]he private, subjective feelings of the negotiators are irrelevant and unhelpful to the Court's consideration of a contract's meaning, because the meaning of a properly formed contract must be shared or common." *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 835 (Del. Ch. 2007) (footnote omitted).

## A.    Does The SPA Adjustment Provision Contemplate Arbitration?

The Purchaser claims that the SPA Adjustment Provision calls for arbitration. Mona contends that the SPA Adjustment Provision calls for an expert determination. The parties have presented their arguments as if those were exclusive alternatives, but that is a false

dichotomy. Both are forms of binding ADR.[2] Parties can use the language of contract to create ADR mechanisms that fall along a spectrum. An arbitration under the FAA that has the look and feel of a private court proceeding occupies one end of the spectrum. *See* Goldberg, *supra*, at 4–5. An expert determination in which a technical expert makes a determination on its own with only limited party input occupies the other end of the spectrum. *Id.* The SPA Adjustment Provision is an Accountant True-Up Mechanism, which occupies a well-defined niche along the spectrum. Generally speaking, an Accountant True-Up Mechanism does not involve arbitration under the FAA; it calls for an expert determination.

Read as a whole, the SPA Adjustment Provision does not involve arbitration under the FAA. Although it describes the Independent Accountant as an arbitrator, it calls for an expert determination.

### 1. The Two Ends Of The ADR Spectrum

To understand the niche role of an Accountant True-Up Mechanism, it helps to start with the two poles of the ADR spectrum. At one end is an arbitration that has the look and feel of a judicial proceeding, except that it is handled privately and with less formality. At

---

[2] In binding ADR, a decisionmaker provides the parties with an outcome. Binding ADR contrasts with non-binding methods, such as mediation, conciliation, or facilitated negotiation, where the ADR professional assists the parties in reaching an outcome, but does not provide the outcome. *See generally* Clive Freedman & James Farrell, *Kendall on Expert Determination* 411 (5th ed. 2015) [hereinafter *Kendall on Experts*]; Stephen B. Goldberg et al., *Dispute Resolution: Negotiation, Mediation, and Other Processes* (5th ed. 2007).

the other end is an expert determination in which an expert with technical skills or knowledge makes a determination, largely on its own, and with only limited party input. *See Kendall on Experts*, *supra*, at 6–7.

In broad terms, an arbitration generally has the following characteristics:

- The arbitrator is an individual or panel of individuals who are usually legal professionals, such as retired judges, practicing attorneys, or law professors.

- The arbitration is conducted under the ambit of a sponsoring organization, such as the American Arbitration Association ("AAA") or JAMS ADR.

- The arbitration proceeds using an established set of procedural rules, often promulgated by the sponsoring organization.

- The arbitrator rules on the procedures governing the arbitration, just as a judge would rule on procedural questions in a court proceeding.

- The parties are represented by counsel, and the lawyers shape the proceedings by making arguments and presenting each side's position.

- The arbitrator takes evidence and hears testimony.

- The arbitrator issues an award, enforceable in the same manner as a court judgment.

- The arbitrator has immunity from suit, as would a judicial officer.

- The arbitrator's decision is subject to appeal, albeit under a standard that is highly deferential to the arbitral award.

- The proceeding is governed by the FAA or a state-law statutory counterpart.

An arbitration with these characteristics has a great deal in common with litigation. *See id.* at 20. Some authorities call it "classic arbitration." *See Penton Bus. Media Hldgs., LLC v. Informa PLC*, 252 A.3d 445, 463 (Del. Ch. 2018) (collecting cases). Because of its similarities to a legal proceeding, let's call it "legal arbitration."

This high-level picture of legal arbitration is only a generalization. Parties can use the language in a contract to create an arbitral regime that has more or fewer court-like features. Parties can, for example, select someone other than a legal professional to act as arbitrator, limit the scope of the arbitrator's authority, or craft special rules to govern a given dispute. One example of an arbitration with relatively few court-like features is baseball arbitration, in which each side provides the arbitrator with a proposed outcome and the arbitrator must choose one. *See Agiliance, Inc. v. Resolver SOAR, LLC*, 2019 WL 343668, at \*4 (Del. Ch. Jan. 25, 2019)

At the other end of the ADR spectrum is an expert determination, which provides parties with a quick and relatively inexpensive answer on an issue that calls for informed judgment. *Kendall on Experts*, *supra*, at 1. Originally, experts often determined the value of an asset, and much of the early law refers to the expert determination process as a "valuation" or "appraisement". *Id.* at 4–5. Today, a range of commercial agreements call for expert determinations in diverse areas. *See id.* at 1. The amounts at stake can be large, with millions or billions of dollars turning on the expert's determination. *See id.* at 2.

Although experts are often loosely described as being some kind of arbitrator, "[t]he fact is that they are not." *Id.* "Experts are a distinct species of dispute resolver." *Id.* The expert can be a firm, not an individual. *Id.* at 3. The expert does not operate under a set of established procedural rules and generally has broad investigatory powers. Although the parties may engage with the expert through counsel, lawyers are not the principal players, and the expert can take an inquisitorial, investigative approach. Experts are not immune from suit and can be held liable. Unless the contract specifies, an expert determination is

18

not reviewable by a court. Expert determinations generally operate like factual determinations and are unenforceable in their own right. Most importantly, expert determinations are governed by state contract law, and not by the FAA or a state-level equivalent. *See generally Ray Beyond Corp. v. Trimaran Fund Mgmt., L.L.C.*, 2019 WL 366614, at *6 (Del. Ch. Jan. 29, 2019) (describing features of an expert determination); *Penton*, 252 A.3d at 455 (same); Steven H. Reisberg, *What Is Expert Determination? The Secret Alternative to Arbitration*, 250 N.Y. L.J. No. 115 (Dec. 13, 2013) (same).

As with the description of a legal arbitration, these statements about an expert determination are generalizations. Just as parties can tailor a legal arbitration, they can also tailor an expert determination.

In between the two poles is another well-established form of ADR: the Accountant True-Up Mechanism. Purchase agreements governing the sale of private companies routinely include Accountant True-Up Mechanisms. Comm. on Int'l Com. Disputes, N.Y.C. Bar Ass'n, *Purchase Price Adjustment Clauses and Expert Determinations: Legal Issues, Practical Problems and Suggested Improvements* 1 (2013) [hereinafter "N.Y.C. Bar Report"]. In one standard use case, the parties "agree that any dispute concerning the values reported in the financial schedules used by the parties to determine the amount of any price adjustment are to be submitted to an independent accounting firm for a final and binding determination." *Id.*

> The types of disputed items that typically end up being submitted . . . are often proposed adjustments that are significant in dollar amount, involve real or perceived departures from the company's historical accounting practices, require significant judgment under GAAP, and/or involve real or perceived departures from provisions of the purchase agreement such as transaction-

19

specific non-GAAP adjustments. For example, the buyer proposes to reduce accounts receivable by $1 million based on its assessment that certain older receivables should be written off in accordance with GAAP. The seller perceives the change as based on the buyer's preference for a strict accounts receivable aging methodology to determine the allowance for a doubtful accounts. The seller disputes the proposed adjustment as violating the purchase agreement provision requiring the use of the seller's historical accounting policies.

A. Vincent Biemans & Gerald M. Hansen, *M&A Disputes: A Professional Guide to Accounting Arbitrations* 19–20 (2017) (hereinafter *M&A Disputes*).[3]

An Accountant True-Up Mechanism has standardized steps:

- The agreement gives the purchaser a defined period of time to prepare a proposed post-closing statement to be used to adjust the purchase price.

- The purchaser submits the proposed post-closing statement to the seller.

- The agreement gives the seller a defined period of time to review the proposed post-closing statement.

- If the seller agrees with the statement, then then the purchase price is adjusted based on the post-closing statement.

- If the seller disagrees with the statement, then the seller submits a written response detailing any objections.

- If the seller submits an objection notice then the parties engage in negotiations for a set period.

- If the disputes remain, they are submitted to an accountant for resolution.

- During the dispute resolution phase, the parties tender initial and rebuttal submissions with supporting documentation.

---

[3] *M&A Disputes* is a monograph about how Accountant True-Up Mechanisms work. Although the book makes clear that an Accountant True-Up Mechanism is its own unique animal, the authors refer to the mechanism as an "accountant arbitration." That usage is confusing, and this decision eschews it.

- The accountant's determination is final and binding.

*See M&A Disputes* at 15–23. If these features sound like a description of the SPA Adjustment Provision, that is no accident. The SPA Adjustment Provision is a run-of-the-mill Accountant True-Up Mechanism.

### 2. An Accountant True-Up Mechanism Is Not An Arbitration.

When including an Accountant True-Up Mechanism in a transaction agreement, drafters sometimes complicate matters by using a term like "arbitrator" or "arbitration" rather than "expert" or "expert determination." There does not seem to be any pattern to when arbitral terms appear. Nor does arbitral language affect what the accountant does. Regardless of what language the provision uses, "[t]he dispute resolution process before the independent accountant and the issues at play . . . are typically the same." *M&A Disputes*, *supra*, at 11.

Whether the Accountant True-Up Mechanism contains arbitral language also has not historically constrained the arguments that litigators make in court. When fighting over what issues go to the accountant, the side that wants a broader, more encompassing referral regularly invokes arbitral precedents. All else equal, the purchaser generally will want to send issues to the accountant, because after closing, the purchaser controls the acquired company, has access to all of its documents, and has prepared the post-closing statement that the accountant will work from. For the purchaser, a constrained proceeding before an expert accountant is likely to be more advantageous than litigation involving wide-ranging discovery where the matter will end up before a non-expert judge or jury. All else equal, the seller will have contrary motivations.

21

Public policy favors arbitration, so a party that wants to resolve disputes using an Accountant True-Up Mechanism will argue that it is a form of arbitration. That argument can gain traction because judges and lawyers are not always familiar with the concept of an expert determination. *See Penton*, 252 A.3d at 455–56 (noting that many jurisdictions have lost the distinction between arbitration and expert determination). As a result, the battle may be fought using arbitral concepts. *Id.*at 459–61 (identifying three Delaware precedents where the parties treated an Accountant True-Up Mechanism as a form of arbitration).

The use of terms like "arbitrator" or "arbitration" reinforces the instinct to invoke arbitral concepts. Words like that generally trigger the application of the FAA. If the FAA applies, then the court must engage with three questions: (i) whether the dispute is arbitrable (the "Arbitrability Question"), (ii) who decides whether the dispute is arbitrable (the "Who Decides Question"), and (iii) whether the parties delegated the Who Decides Question to an arbitrator through a delegation provision (the "Delegation Question"). *See Fairstead Cap. Mgmt. LLC v. Blodgett*, 288 A.3d 729, 750–51 (Del. Ch. 2023).

In practice, the court grapples with these questions in the opposite order, starting with the Delegation Question. In a standard Accountant True-Up Mechanism, the provision does not delegate the Who Decides Question to the arbitrator. That means the court will decide the Who Decides Question and, in an arbitral framework, deploys the concepts of substantive arbitrability and procedural arbitrability. Decisions on substantive arbitrability are limited to "gateway questions" about the existence, validity, and enforceability of an arbitration agreement. *Viacom Int'l, Inc. v. Winshall*, 2012 WL 3249620, at *12 (Del. Ch.

22

Aug. 9, 2012), *aff'd*, 72 A.3d 78 (Del. 2012). Courts presumptively decide questions of substantive arbitrability. *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 79. Procedural arbitrability encompasses questions about compliance with procedural aspects of the arbitration agreement, including "whether prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met, as well as allegations of waiver, delay or a like defense to arbitrability." *Viacom*, 2012 WL 3249620, at *12. Arbitrators presumptively decide questions of procedural arbitrability. *James & Jackson*, 906 A.2d at 79.

When an ADR provision contemplates a legal arbitration, the doctrines of substantive and procedural arbitrability make perfect sense. For an Accountant True-Up Mechanism, those doctrines can generate odd results. Applied strictly, they lead to an independent accountant addressing not only accounting issues, but also questions of contract interpretation such as whether a buyer prepared a timely post-closing statement, or whether a seller responded with a proper objection notice. Sometimes, an accountant may be well-positioned to address a procedural issue, such as determining whether the objection notice provided a sufficient description of the issue in dispute. But if a dispute over timely notice turns on reviewing correspondence between the parties and analyzing legal issues like waiver or estoppel, then the inquiry likely goes beyond what the parties intended for the independent accountant to resolve.

Because of the doctrinal significance of the arbitral framework, a court must ask at the outset whether the parties have opted for arbitration. *Fairstead*, 288 A.3d at 753. To answer that question, the Delaware Supreme Court has adopted an analytical framework

23

proposed by the New York City Bar Committee on International Commercial Disputes. *Terrell*, 297 A.3d at 618 (citing N.Y.C. Bar Report, *supra*). The test turns primarily on the degree of authority delegated to the decision-maker. Other leading commercial jurisdictions also use the authority test. *See Penton*, 252 A.3d at 462 (collecting cases). Black letter sources and treatises endorse it as well.[4]

The authority test compares the features of the parties' ADR mechanism with the avatars of a legal arbitration and an expert determination. *Terrell*, 297 A.3d at 5–6. Under the authority test, using the word "arbitrator" or "arbitration" provides a signal about what the parties intended, but it is not dispositive. The court must examine the nature and scope of the authority that the agreement provides. *See Penton*, 252 A.3d at 458; *EMSI Acqs., Inc. v. Contrarian Funds, LLC*, 2017 WL 1732369, at *16 (Del. Ch. May 3, 2017); *Kendall on Experts*, *supra*, at 411.

---

[4] *See, e.g.*, 4 Am. Jur. 2d *Alternative Dispute Resolution* § 3, Westlaw (database updated May 2023) ("An agreement for arbitration ordinarily encompasses the disposition of the entire controversy between the parties upon which award a judgment may be entered, whereas an agreement for appraisal extends merely to the resolution of the specific issues of actual cash value and the amount of loss, all other issues being reserved for determination in a plenary action before the court."); 6 C.J.S. *Arbitration* § 2, Westlaw (database updated August 2023) ("While arbitration determines the rights and liabilities of the parties, appraisal merely binds the parties to have the extent or amount of a loss determined in a particular way."); 21 Richard A. Lord, *Williston on Contracts* § 57:8, Westlaw (database updated May 2023) ("[T]he final test should be whether or not the parties intended the 'arbitrators' to determine ultimate liability or merely facts incidental thereto."); 1 Thomas H. Oehmke & Joan M. Brovins, *Commercial Arbitration* § 1:11, Westlaw (database updated September 2023) ("Arbitration clauses send the entire dispute over liability and damages to an arbitral tribunal, divesting the court of jurisdiction over the merits. More limited is appraisal which simply sets the amount of loss, leaving the liability determination to be negotiated or litigated.") (footnotes omitted)).

When a provision uses the word "arbitrator" or "arbitration" *and* refers the dispute to an arbitral organization with an established set of arbitral rules, then that provision presumptively calls for legal arbitration. As the ADR provision moves away from that paradigmatic example, the parties' intent becomes less certain. An Accountant True-Up Mechanism is far enough along the spectrum that it is not legal arbitration, no matter what label the parties use for the independent accountant.

Admittedly, Delaware courts have not always used the authority test or treated Accountant True-Up Mechanisms as a distinct category of ADR. There are two Delaware decisions that gave seemingly dispositive weight to the appearance of the words "arbitrator" or "arbitration" in an Accountant True-Up Mechanism.[5] Both pre-dated the Delaware Supreme Court's adoption of the authority test in *Terrell*. Both also pre-dated the Delaware Supreme Court's decision in *Chicago Bridge*, which emphasized the narrow scope of an Accountant True-Up Mechanism where an independent accountant acted as an expert and not as an arbitrator. *See Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co.*

---

[5] *HDS Inv. Hldg. Inc. v. The Home Depot, Inc.*, 2008 WL 4606262, at \*5 (Del. Ch. Oct. 17, 2008) (applying doctrine of substantive arbitrability when agreement stated that the "Neutral Auditors shall act as an arbitrator" for disputes over Closing Statement determination), *abrogated on other grounds by Viacom Int'l, Inc. v. Winshall*, 72 A.3d 78 (Del. 2013); *Mehiel v. Solo Cup Co.*, 2005 WL 1252348, at \*5 (Del. Ch. May 13, 2005) (applying doctrine of substantive arbitrability when agreement stated that "Neutral Auditor shall act as an arbitrator" for dispute over Closing Working Capital determination). In both cases, the parties appear to have assumed that arbitral doctrines applied, and the court was not asked to consider whether the "arbitration" provisions were in fact something else, such as an Accountant True-Up Mechanism. The parties briefed their arguments in terms of arbitral concepts, and the court followed suit.

*LLC*, 166 A.3d 912, 931 (Del. 2017). Only after *Chicago Bridge* did this court focus more closely on the distinction between an arbitration and an expert determination.[6]

Only one post-*Chicago Bridge* decision has treated an Accountant True-Up Mechanism as an arbitration provision, and there the distinction did not matter. *See Agiliance*, 2019 WL 343668. The mechanism in *Agiliance* addressed disputes over net working capital and provided that that if the parties could not reach an agreement, then the dispute "shall be submitted for arbitration by a nationally-recognized [sic] accounting firm that agrees to use its best efforts to complete such arbitration within thirty (30) days." *Id.* at *1. The provision called for the parties to submit proposed determinations and for the accounting firm to pick one. The provision also stated that "[t]he determination of the Accounting Firm shall constitute an arbitral award that is final, binding and unappealable and upon which a judgment may be entered by any court having jurisdiction thereof." *Id.* The court found that the plain language of the agreement called for baseball arbitration. *Id.* at *4. In reaching this conclusion, the court enforced the language of the provision as

---

[6] *See, e.g.*, *Ray Beyond Corp.* 2019 WL 366614, at *1 ("The Merger Agreement designates the independent accountant 'an expert, not an arbitrator.'"); *Penton*, 252 A.3d at 461 (quoting the relevant provision in the merger agreement as stating that, "[i]n resolving the items in dispute, the parties agree that the Accounting Firm shall be acting as an accounting expert only and not as an arbitrator and shall not import or take into account usage, custom or other extrinsic factors."); *EMSI*, 2017 WL 1732369, at *16 ("[T]he SPA explicitly provides that the Settlement Auditor will resolve disputes over the calculation Net Working Capital 'acting as an expert and not an arbitrator.'"). This is not to say that all pre-*Chicago Bridge* decisions had de-emphasized the distinction. *See AQSR India Priv., Ltd. v. Bureau Veritas Hldgs., Inc.*, 2009 WL 1707910, at *7 (Del. Ch. June 16, 2009) ("[T]he Agreement itself indicates, it was 'understood that in performing such review, the Referee shall be functioning as an expert and not as an arbitrator.'").

written, just as the court would have done with any other type of contractual ADR mechanism.

A standard Accountant True-Up Mechanism is too far away from legal arbitration to be governed by the FAA. That is true even if the parties refer to an independent accountant as an arbitrator or to the accountant's determination as an arbitral award. To shift an Accountant True-Up Mechanism into the arbitral side of the spectrum, the provision needs to do more, such as by specifying a sponsoring arbitral organization and designating a set of arbitral rules. Without additional signals, an Accountant True-Up Mechanism is a beefed-up expert determination, not a slimmed down legal arbitration.

### 3.    What Is The SPA Adjustment Provision?

The SPA Adjustment Provision is an Accountant True-Up Mechanism. Although it uses the term "arbitrator," it plainly contemplates an expert determination.

Under the authority test, the court must evaluate whether the parties agreed to legal arbitration or something sufficiently similar to trigger the doctrinal framework of the FAA. The primary factor is the scope of the decision-maker's authority and whether it more closely resembles the broad authority conferred on a legal arbitrator, who can decide the entirety of the controversy and award final relief, or whether the grant is narrower and involves more fact-like determinations. *See Terrell*, 297 A.3d at 6. The SPA Adjustment Provision contains straightforward language defining its scope:

> If, at the conclusion of the Resolution Period, Purchaser and Seller have not reached an agreement with respect to all disputed matters contained in the Objection Notice, then within ten (10) Business Days thereafter, Purchaser and Seller shall submit those matters remaining in dispute to the Independent Accountant for resolution.

27

SPA § 2.6(d). That sentence is the essence of an Accountant True-Up Mechanism. The Independent Accountant can only decide the disputed matters identified in the Objection Notice, not the parties' disputes generally. The Stock Purchase Agreement contemplates that other disputes will be resolved by a court. *See* SPA §§ 7.1 & 8.11. The narrow scope of the SPA Adjustment Provision is consistent with an expert determination and inconsistent with legal arbitration. *See Ray Beyond*, 2019 WL 366614, at *6.

Other features of an ADR mechanism can provide secondary evidence of the parties' intent. The SPA Adjustment Provision states as follows:

> The Independent Accountant shall act as an arbitrator to resolve (based solely on the written presentations of Purchaser and Seller and not by independent review) only those matters submitted to it in accordance with the first sentence of this Section 2.6(d), [sic] and shall render a resolution of all such disputed matters within thirty (30) days after its engagement. In deciding any matter, the Independent Accountant (i) shall be bound by the provisions of this Section 2.6, and (ii) may not assign a value to any item greater than the greatest value for such item claimed by either Purchaser or Seller, or less than the smallest value for such item claimed by either Purchaser or Seller. The Independent Accountant shall set forth its conclusions in a written statement delivered to Purchaser and Seller and shall be final, binding, conclusive and non-appealable for all purposes hereunder, other than manifest error.

SPA § 2.6(d). Although the first eight words of this excerpt call for the Independent Accountant to act as an arbitrator, the balance of the language describes a standard Accountant True-Up Mechanism involving an expert determination.

The first clue is that the decision maker is an Independent Accountant. That choice strongly suggests an intent to rely on the Independent Accountant's subject matter expertise, which is consistent with an Accountant True-Up Mechanism and inconsistent with legal arbitration. *See Ray Beyond*, 2019 WL 366614, at *6, 8.

28

A second clue is the absence of any reference to a set of procedural rules, which is "a defining characteristic of arbitration provisions." *Terrell*, 297 A.3d at 619 (quoting *Ray Beyond*, 2019 WL 366614, at *7). "Arbitration provisions typically include procedural rules affording each party the opportunity to present its case." *Ray Beyond*, 2019 WL 366614, at *7. The SPA Adjustment Provision does not refer to a set of arbitral rules or to an arbitral organization that might supply one. That choice is consistent with an Accountant True-Up Mechanism and inconsistent with legal arbitration.

A third clue is the nature of the parties' submissions and the absence of a hearing. "[A]n arbitrator is required to decide the matter only on the evidence submitted by the parties. An arbitrator may not engage in any independent investigation, hear evidence outside the presence of the parties, or participate in any *ex parte* communications." N.Y.C. Bar Report, *supra*, at 5. A legal arbitration generally involves one or more hearings at which evidence is presented. By contrast, "[e]xperts are allowed to be more inquisitorial than judges and are not required to decide the dispute only on evidence submitted to them by the parties." *Id.* An expert determination need not involve a hearing. The SPA Adjustment Provision obligates the Independent Accountant to resolve disputes "based solely on the written presentations of Purchaser and Seller and not by independent review," and it does not require a hearing. SPA § 2.6(d). The prohibition on inquisitorial investigation is more like an arbitration, but the limitation to written presentations is more like an expert determination. This structure is a common feature of an Accountant True-Up Mechanism, which seeks to create an efficient alternative to litigation. This feature, too, is more like an expert determination than a legal arbitration.

29

A final feature is the standard of review. Both legal arbitrations and expert determinations are binding decisions.[7] The standard of review, however, is different. "Review on the basis of manifest error is recognized under the law of contracts with respect to appraisals and expert determinations."[8] Manifest error is not a statutory basis for review of an arbitration award under the FAA,[9] and parties cannot alter the standard of review

---

[7] *Kendall on Experts*, *supra*, at 19–20 ("One way of classifying systems of dispute resolution is to consider two fundamental issues about each: whether the system is binding or non-binding, and whether the procedure is 'due process' or informal. . . . [L]itigation and arbitration have a great deal in common, both being binding systems where due process must be followed. . . . Expert determination is a binding system, but does not operate by due process."); N.Y.C. Bar Report, *supra*, at 14 ("Because expert determinations and arbitrations are both private contractual forms of alternative dispute resolution intended to lead to a result that is final and binding on the parties, the two proceedings have been described as 'close cousins.'").

[8] N.Y.C. Bar Report, *supra*, at 47; *Id.* at 6 ("[P]arties can contractually set the standard of review to be applied in reviewing the expert's determination, such as that the expert's determination shall be final and binding on all parties, except in the case of manifest error."); *see Morris, Nichols, Arsht & Tunnell v. R-H Int'l, Ltd.*, 1987 WL 33980, at *4 (Del. Ch. Dec. 29, 1987) ("[T]his Court has held that an appraisal procedure is not the equivalent of arbitration and that this court is not limited in its review of an appraisal as it would be in the case of an arbitration.").

[9] N.Y.C. Bar Report, *supra*, at 47 n.89 ("The general state law standard for review allows an expert determination to be set aside in the case of 'fraud, bad faith or palpable mistake.'") (citation omitted); *Kendall on Experts*, *supra*, at 346 ("Expert determination clauses often provide that the decision is to be final and binding 'in the absence of manifest error.'"); *Evanston Ins. Co. v. Cogswell Props., LLC*, 683 F.3d 684, 696 (6th Cir. 2012) ("[The Party's] attempt to recast the appraisal provision as an arbitration provision is understandable because the FAA might have afforded a more deferential standard of review to the arbitrator's decision.").

established by the FAA.[10] The SPA Adjustment Provision contemplates that the Independent Accountant's determinations are "final, binding, conclusive and non-appealable for all purposes hereunder, other than manifest error." SPA § 2.6(d).

Although the parties referred to the Independent Accountant as an "arbitrator," they did not contract for arbitration. They contracted for an Accountant True-Up Mechanism. Arbitral principles do not apply.

## B.    What Disputes Does The SPA Adjustment Provision Cover?

Because the SPA Adjustment Provision contemplates a process other than a legal arbitration, principles of contract interpretation determine whether a disputed issues falls within its scope. *Terrell*, 297 A.3d at 617. The parties have identified a series of disputes. The Purchaser argues that each must go to the Independent Accountant. Mona argues that each must be resolved by the court.

---

[10] *See Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 585–86 (2008) ("Hall Street says that the agreement to review for legal error ought to prevail simply because arbitration is a creature of contract, and the FAA is 'motivated, first and foremost, by a congressional desire to enforce agreements into which parties have entered.' . . . But to rest this case on the general policy of treating arbitration agreements as enforceable as such would be to beg the question, which is whether the FAA has textual features at odds with enforcing a contract to expand judicial review following the arbitration. To that particular question we think the answer is yes . . . .") (citation omitted); *see also* N.Y.C. Bar Report, *supra*, at 47–48 ("[B]y categorizing the proceeding as an arbitration, the court deprived the parties of the ability by contract to specify a standard of review." (discussing *Viacom*, 2012 WL 3249620, at *11)).

### 1. Whether An Accounting Method Complies With Past Practice

The SPA Adjustment Provision calls for the Independent Accountant to resolve any disputes about whether the Adjusted Closing Balance Sheet was prepared "consistent with the past practices of the Company and the November Balance Sheet." SPA § 2.6(a). Mona argues that this court must declare what "past practices" means. Mona's view is too extreme, but some guidance will be helpful.

A court need not construe every word in a provision calling for an expert determination before the expert can do its work.

> It may be necessary for the expert, in order to decide the point which has been referred to him, to decide a disputed point of interpretation of the contract between the parties. Unless it is clear that the expert has no jurisdiction to decide a disputed point of interpretation, the expert will normally reach his own decision on the point, leaving the parties to refer the matter to the court at a later date should they wish to do so.

*Kendall on Experts*, *supra*, at 229. The more closely related the term or provision is to the expert's area of expertise, the more likely it is that an expert can interpret the term without judicial assistance. *Id.*

Most purchase agreements use some version of the phrase "past practices in accordance with GAAP" to define how a post-closing statement must be prepared. *M&A Disputes*, *supra*, at 30, 54–55. This phrase and its variants simply mean using the same method of accounting treatment that was used in the reference statement, provided that method is currently in accordance with GAAP.

For some accounting practices, maintaining consistency is obvious. If a company accounted for inventory using LIFO, consistency with past practice prohibits switching to

32

FIFO. But many accounting entries require the exercise of judgment, such that "even the agreed-upon application of the company's own historical accounting practices can still lead to a relatively wide range of possible outcomes dependent on the applicable facts and circumstances." *Id.* at 56. To the extent an item requires the exercise of judgment, as accounting statements often do, the concept of consistency with past practice calls for reaching an outcome by a method that is as analogous as possible to the method that management used historically. If, as here, the agreement identifies a financial statement for reference (*i.e.*, the November Balance Sheet), consistency with past practice means to determine the comparable entry in the post-closing statement using a method that is as analogous as possible to the method used for the same entry in the reference statement. If an item did not appear on the November Balance Sheet or an issue did not arise, then consistency with past practice means using a method that is as analogous as possible to historical methods the Company has used. Put another way, the outcome for the post-closing statement should be, to the extent possible, the outcome that the management team would have reached if the same circumstances had been presented when they prepared the reference statement. *Id.* at 59–60.

Mona argues that consistency with past practices also means using the same systems and practices to generate the post-closing statement that were used to generate the financial statements used for reference. He goes so far as to argue that this requires maintaining pre-closing standards of managerial excellence and, by extension, not firing the CFO or other employees who were in charge of the finance function. That is not accurate. A requirement to prepare a post-closing statement that is consistent with past practices is not a covenant

33

to continue managing the business's finances as they were operated pre-closing. Preparing a post-closing statement consistent with past practices means consistent with past accounting practices, not past business practices.

More than that cannot be said. Accountants operating within the framework of Accountant True-Up Mechanisms routinely make determinations about consistency with past practice. The Independent Account can do so here.

### 2. Whether GAAP Overrides Past Practices

The SPA Adjustment Provision calls for the Independent Accountant to resolve any disputes about whether the Adjusted Closing Balance Sheet was prepared "in accordance with GAAP and consistent with the past practices of the Company and the November Balance Sheet." SPA § 2.6(a). Mona argues that this court should declare that GAAP does not trump past practices. That is obviously true.

Taking the items in reverse order, the requirement that the accounting treatment be consistent with past practices limits the available methods of accounting treatment that are otherwise permitted by GAAP and promotes comparability between the post-closing statement and the reference statement:

> GAAP by itself is not narrowly prescriptive on many accounting topics. Rather, it provides companies with many acceptable accounting choices …. Including the company's *past practices* incorporates the accounting choices as the company has historically made them and thus narrows the possible outcomes. It also increases comparability with historical financial information, including the basis on which the target net working capital was derived.

*M&A Disputes*, *supra,* at 31.

34

The requirement that the treatment be in accordance with GAAP is just as important and establishes a floor.

> The seller may have historically implemented non-GAAP compliant accounting practices that would then—pursuant to the purchase agreement—be used to determine part of the purchase price. Without the contractual requirement that those past practices comply with GAAP, the buyer may be exposed to an unexpected and disadvantageous purchase price adjustment without a contractual basis to challenge the additional payment. The buyer is typically not in a position to verify that net working capital is accounted for in accordance with GAAP until after the transaction has closed.

*Id.*

For the SPA Adjustment Provision, there is a third aspect: consistency with the November Balance Sheet. SPA § 2.6(a). Like consistency with past practices, consistency with the November Balance Sheet narrows the available choices under GAAP. To be consistent with the November Balance Sheet, the Adjusted Closing Balance Sheet must use the same accounting treatment used to prepare the November Balance Sheet, as long as that method would comply with GAAP for purposes of the Adjusted Closing Balance Sheet.

The starting point under the SPA Adjustment Provision, therefore, is consistency with the November Balance Sheet. If there is an issue that the November Balance Sheet did not address, then the Purchaser must use methods consistent with past practices. The Purchaser is required to use those methods unless their use does not comply with GAAP, either generally or for purposes of preparing the Adjusted Closing Balance Sheet. The former could happen if the original method was generally not GAAP-compliant. The latter could happen if the method was GAAP-compliant for purposes of the November Balance

Sheet, but due to changes in circumstances or GAAP itself, the method would not be GAAP-compliant for purposes of the Adjusted Closing Balance Sheet. If the same accounting treatment cannot be used, then the Purchaser is obligated to use judgment to adopt a method for purposes of the Adjusted Closing Balance Sheet that is both GAAP-compliant and as consistent as possible with the Company's past practices and the November Balance Sheet. As discussed in the prior section, that means the Purchaser must strive in the Adjusted Closing Balance Sheet to account for the issue using a method that is as analogous as possible to the method used for the same item in the November Balance Sheet so as to reach, to the extent possible, the outcome that the management team would have reached if the same circumstances had been presented to them. *M&A Disputes*, *supra,* at 59–60.

Under this standard, if the Company used a method in the November Balance Sheet that would have complied with GAAP for purposes of preparing the Adjusted Closing Balance Sheet, then the Purchaser was obligated use that same method. If the Purchaser did not, and if Mona properly objected, then the Independent Accountant must make an adjustment.

Likewise, if the Adjusted Balance Sheet required a determination of the proper accounting treatment for an issue that was not addressed in the November Balance Sheet but the Company historically used a method to address that issue that would have complied with GAAP for purposes of preparing the Adjusted Closing Balance Sheet, then the Purchaser was obligated use that historical method. If the Purchaser did not, and if Mona properly objected, then the Independent Accountant must make an adjustment.

36

Conversely, if the Company used a method—either historically or for the November Balance Sheet—that would not comply with GAAP for purposes of preparing the Adjusted Closing Balance Sheet, then the Purchaser could not continue to use that method. If the Purchaser continued to use that method, and if Mona properly objected, then the Independent Accountant must make an adjustment. Likewise, if the Company used a method—either for the November Balance Sheet or historically—that would not comply with GAAP for purposes of preparing the Adjusted Closing Balance Sheet, and if the Purchaser selected a GAAP-compliant method but there was another GAAP-compliant method that was more consistent with the Company's past practices, and if Mona properly objected, then the Independent Accountant must make an adjustment.

### 3. Express Good Faith

In addition to requiring that the Adjusted Closing Balance Sheet be prepared "in accordance with GAAP and consistent with the past practices of the Company and the November Balance Sheet," the SPA Adjustment Provision requires that the Purchaser prepare the closing statement "in good faith." SPA § 2.6(a). Mona argues that this court must make a threshold determination about whether the Purchaser acted in good faith. He reasons that absent a finding of good faith, the Purchaser cannot compel reliance on the Accountant True-Up Mechanism. As evidence of the Purchaser's failure to act in good faith, Mona seeks to rely on everything that happened from the beginning of the sale process through this litigation.

As a reminder, the SPA Adjustment Provision specifies that:

37

Within ten (10) days after the end of the Adjustment Period, Purchaser shall prepare and deliver to Seller, Closing Date Margin Statements and an adjusted balance sheet of the Company as of the end of the day immediately preceding the Closing Date (the "Adjusted Closing Balance Sheet"), *prepared in good faith* and in accordance with GAAP and consistent with the past practices of the Company and the November Balance Sheet . . . .

SPA § 2.6(a). The good faith requirement relates to the preparation and delivery of the Adjusted Closing Balance Sheet. It is not a freestanding obligation to act in good faith. Nor is it distinct from or more important than the obligations that the Adjusted Closing Balance Sheet be prepared "in accordance with GAAP and consistent with the past practices of the Company and the November Balance Sheet."

Under the familiar principle of *noscitur a sociis*, "a word in a contract is to be read in light of the words around it." *Smartmatic Int'l Corp. v. Dominion Voting Sys. Int'l Corp.*, 2013 WL 1821608, at *10 (Del. Ch. May 1, 2013). The SPA Adjustment Provision obligates the Purchaser to prepare the Adjusted Closing Balance Sheet (i) in good faith, (ii) in accordance with GAAP, (iii) consistent with the Company's past practices, and (iv) consistent with the November Balance Sheet. Each of these requirements refers to the preparation of the Adjusted Closing Balance Sheet. Each refers to how the Purchaser must go about preparing the entries for the Adjusted Closing Balance Sheet.

Accounting True-Up Mechanisms often contain a requirement that the purchaser prepare a post-closing statement in good faith.[11] The concept of good faith in this setting

_____

[11] *See, e.g.*, *Chicago Bridge*, 166 A.3d at 922 ("The multi-step True Up process began just before closing. First, at least three business days before closing, Chicago Bridge had to deliver a statement to Westinghouse of its good faith estimate of certain amounts

means that the preparer must believe that the accounting entries are accurate, fairly reflect the financial position of the company, and comply with the contractual standard.

Whether that standard is met is a question for the Independent Accountant. Just as the Independent Accountant is charged with addressing whether the Adjusted Closing Balance Sheet was prepared in accordance with GAAP, consistent with the Company's past practices, and consistent with the November Balance Sheet, the Independent Accountant is charged with determining whether any entry, or any combination of entries, was prepared in such a way as to indicate a lack of good faith.

Words like good faith and bad faith refer to an individual's mental state, and currently available technology does not make an individual's mental state directly observable. That is true for all humans, including judges. As the Delaware Supreme Court has noted, the members of the Court of Chancery "cannot peer into the hearts and souls of directors to determine their subjective intent with certainty." *Allen v. Encore Energy P'rs, L.P.* (*Encore I*), 72 A.3d 93, 106 (Del. 2013) (internal quotations omitted). "Without the ability to read minds, a trial judge only can infer a party's subjective intent from external indications." *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 178 (Del. Ch. 2014).

---

(the 'Closing Payment Statement'), including the Net Working Capital Amount."); *Hallisey v. Artic Intermediate, LLC*, 2020 WL 6438990, at \*1 (Del. Ch. Oct. 29, 2020) ("Not later than six (6) months after the Closing Date, Buyer shall prepare and deliver to Seller Representative a report (the 'Closing Date Report') of (a) Buyer's written, good faith determination and calculation of (i) the Closing Cash, (ii) the Net Working Capital, and (iii) the Adjusted Target Working Capital.").

One of the objective indicia that a trial court can consider is how extreme a decision appears to be. As the Delaware Supreme Court has explained, when facts indicate that the terms of a transaction were extreme, then those facts are "logically relevant" to making a subjective determination of bad faith. *Encore I*, 72 A.3d at 107. The high court made its position on this issue clear because this court had posited that the quality of the decision was "not relevant" when determining a party's good faith. *Id.*

To consider whether a decision appears extreme when assessing bad faith comports with widely accepted scientific learning about the theory of mind.

> While "mind reading" might sound like a mentalist magic trick, for cognitive scientists, it refers to the very pedestrian capacity we all have for figuring out what another human being is thinking . . . . Other people's minds are opaque to us, so we cannot observe them directly. And yet, when someone walks toward the water fountain on a hot day, we know she wants a drink. When someone yelps after stubbing her toe, we know she feels pain. When someone aims an arrow at a target, we know she intends to hit it. We take in observable data about a person and infer something about her unobservable mental life.

Mihailis Diamantis, *How To Read a Corporation's Mind*, *in The Culpable Corporate Mind* 209, 222–23 (Elise Bant ed., 2023) (footnote omitted). Clairvoyance plays no role. "We gather two types of observable information—what the person did and the circumstances in which he did it—and triangulate to a person's unobservable mental states." *Id.* at 223 (footnote omitted).

The Independent Account has the expertise to assess whether the accounting determinations that the Purchaser made, under the circumstances in which the Purchaser made them, are so extreme as to show a lack of good faith. The SPA Adjustment Mechanism properly contemplates that the Independent Accountant will make that

40

determination, which will bind the parties for purposes of any further proceedings in this court.

**4.      The Contractual Obligation To Assign Accounts Receivable For Collection**

The parties next disagree over language in the SPA Adjustment Provision which states that "any and all Accounts Receivable (other than undisputed Retainage, as reasonably determined by Purchaser) that are uncollected as of the end of the Adjustment Period shall be written off and, at the request of Seller, assigned by the Company to Seller." SPA § 2.6(a)(iv). The Stock Purchase Agreement defines "Accounts Receivable" to mean "all accounts receivable, notes receivable, rights to payment from customers and other amounts payable to the extent relating to or arising from the sale of goods or materials and the rendering of services in connection with the operation of the Business." SPA Ex. A at A-1. Mona asks the court to hold that "Accounts Receivable" is *not* limited to accounts receivable that existed on the date of closing. He also asks the court to hold that the Purchaser breached this provision by settling disputes over the Hospital Contract rather than assigning Accounts Receivable to him to pursue.

The parties did themselves a disservice by embedding a substantive obligation in the SPA Adjustment Provision. "One of the more common disputes related to accounts receivable and the allowance involves a combination of write-offs of specifically identified receivables and an increase in the allowance based on aging." *M&A Disputes*, *supra*, at 257. The bulk of the disputed language identifies issues for the Independent Accountant to address. Under that language, "any and all Accounts Receivable (other than undisputed

41

Retainage, as reasonably determined by Purchaser) that are uncollected as of the end of the Adjustment Period shall be written off." The Independent Account must therefore resolve any and all disputes over (i) what qualifies as an Account Receivable, (ii) what qualifies as Retainage, (iii) whether the amount of Retainage was reasonably determined by the Purchaser, (iv) whether any Accounts Receivable were uncollected as of the end of the Adjustment Period, and (v) whether any Accounts Receivable that were uncollected as of the end of the Adjustment Period were properly written off.

The last part of the provision establishes a substantive obligation that the Purchaser must meet. It states that if there are qualifying Accounts Receivable that were uncollected as of the end of the Adjustment Period, then "at the request of Seller," those Accounts Receivable must be "assigned by the Company to Seller." SPA § 2.6(a)(iv). If the Independent Accountant determines that there were qualifying Accounts Receivable, and if Mona contends that despite his request, they were not assigned to him, then he can return to this court and pursue a claim for breach. For purposes of that claim, the Independent Accountant's determination as to whether there were any qualifying Accounts Receivable will be binding on the parties. The court will not revisit it.

### 5. The Implied Covenant Of Good Faith And Fair Dealing

Mona finally argues that the Purchaser calculated the Adjusted Closing Balance Sheet in a manner that breached the implied covenant of good faith and fair dealing. The implied covenant seeks to enforce the parties' contractual bargain by implying terms that the parties would have agreed to during their original negotiations if they had thought to address them. Under Delaware law, a court confronting an implied covenant claim asks

42

whether it is "clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith—had they thought to negotiate with respect to that matter." *Katz v. Oak Indus., Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986) (Allen, C.). "While this test requires resort to a counterfactual world—what if—it is nevertheless appropriately restrictive and commonsensical." *Schwartzberg v. CRITEF Assocs. Ltd. P'ship*, 685 A.2d 365, 376 (Del. Ch. 1996) (Allen, C.).

The temporal focus matters. When ruling on a tort claim, including an equitable tort like breach of fiduciary duty, a court examines the parties as they were situated at the time of the wrong. The court determines whether the defendant owed the plaintiff a duty, considers the defendant's obligations (if any) in light of that duty, and then evaluates whether the duty was breached. Determining the nature of the parties' relationship may mean taking into account historical events, and past dealings can inform the court's analysis, but liability depends on the parties' relationship when the alleged breach occurred.

An implied covenant claim, by contrast, looks to the past. It is not a "free-floating duty unattached to the underlying legal document." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) (alteration omitted). It does not ask what duty the law should impose, but rather what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting. *See Nemec v. Shrader*, 991 A.2d 1120, 1127 (Del. 2010); *Amirsaleh v. Bd. of Trade of N.Y., Inc.*, 2009 WL 3756700, at *4 (Del. Ch. Nov. 9, 2009). "Fair dealing" in this context means an

43

obligation to deal "fairly" in the sense of consistently with the terms of the parties' agreement and its purpose. *Gerber v. Enter. Prod. Holdings, LLC*, 67 A.3d 400, 418–419 (Del. 2013) *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013). "Likewise "good faith" does not envision loyalty to the contractual counterparty, but rather faithfulness to the scope, purpose, and terms of the parties' contract." *Id.* at 419; *accord* Restatement (Second) of Contracts § 205 cmt. a (1981) ("Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party . . . ."). Both necessarily turn on the contract itself and what the parties would have agreed upon had the issue arisen when they were bargaining originally.

The Delaware Supreme Court has recently supplemented these principles by resuscitating a line of authority under which a party can breach the implied covenant by taking action in bad faith, with that term seemingly meaning action taken maliciously in an effort to harm the contractual counterparty. *Baldwin v. New Wood Res. LLC*, 283 A.3d 1099, 1119 (Del. 2022) (discussing *Wilmington Leasing, Inc. v. Parrish Leasing Co., L.P.*, 1996 WL 560190, at *2 (Del. Ch. Sept. 25, 1996)). The high court held that a complaint stated a claim for breach of the implied covenant in that sense because the pleadings described "a hostile and adverse relationship" in which the defendants in control of an entity terminated the plaintiff, determined that he was not entitled to indemnification, then engaged in litigation tactics intended to cause the plaintiff "to incur needless additional attorneys' fees and costs." *Id.* at 1122. The Delaware Supreme Court did not explore what the parties would have agreed to in the original bargaining position or discuss why the

44

defendants' actions departed from that understanding. The opinion instead appeared to deploy the concept of bad faith as a synonym for bad intent, credited the plaintiff's allegation that the entity defendant was "trying to avoid indemnification" and had "taken every opportunity it could to try to avoid paying advancement," and treated that allegation as "sufficient—albeit, barely so" to raise a litigable issue regarding *scienter*. *Id.* at 1121.

The *Baldwin* opinion represents something of a throwback because Delaware decisions have been moving away from using the implied covenant as a vehicle for inquiring into the subjective good faith of the breaching party at the time of the wrong. *E.g.*, *New Wood Res. LLC v. Baldwin*, 2021 WL 3784258, at *6 (Del. Super. Ct. Aug. 23, 2021) (explaining that Baldwin's argument "would create a free-floating obligation of good faith that is not tethered to any unanticipated gap in the LLC Agreement"), *rev'd and remanded*, 283 A.3d 1099 (Del. 2022). Generally speaking, whether a party can establish a breach of contract does not turn on the counterparty's mental state.[12] "The traditional goal of the law of contract remedies has not been compulsion of the promisor to perform his promise but compensation of the promisee for the loss resulting from breach. 'Willful' breaches have not been distinguished from other breaches . . . ." Restatement (Second) of

---

[12] *See*, *e.g.*, *Hifn, Inc. v. Intel Corp.*, 2007 WL 1309376, at *13 (Del.Ch.2007) ("[T]o the extent that [plaintiff] is contending that [defendant's] subjective motivations for wanting out of the contract give rise to an inference that it acted in bad faith, that argument fails under settled law."); *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055 (Del. Ch. 1984) (holding that when a party enforces conditions that "are expressed, the motivation of the invoking party is, in the absence of fraud, of little relevance."), *aff'd*, 575 A.2d 1131 (Del. 1990).

Contracts ch. 16 intro. n. (1981). Under the doctrine of efficient breach, a party who intentionally breaches a contract owes only contract damages; there is no additional measure of opprobrium. *See NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 35 (Del. Ch. 2009) (noting Delaware's recognition of efficient breach). For the implied covenant to contemplate a mental state, however minimal, could be viewed as running counter to those principles and bringing contract law a step closer to tort law.

From another perspective, however, treating the implied covenant as a means of examining the counterparty's mental state merely gives effect to the role of the implied covenant as a source of implied terms. Parties can build express terms into their contracts that turn on a particular mental state. *See, e.g., Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 746–48 (Del. Ch. 2008) (interpreting a merger agreement in which limitation on liability did not apply to a "knowing and intentional breach"). It thus should be possible for a court to imply a term that turns on the counterparty's mental state, and decisions from before the turn of the current millennium had deployed the implied covenant in that fashion.[13] The *Baldwin* decision reinvigorates that approach.

---

[13] *See, e.g.*, *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1208 (Del. 1993) (implying term requiring proof of tortious mental state by holding that limited partner stated a claim for breach of the implied covenant where complaint alleged that "the General Partner has willfully, wrongfully and in bad faith excluded plaintiff from participating in three or more Fund II investments in retaliation for plaintiff's lawsuit."); *Quadrangle Offshore (Cayman) LLC v. Kenetech Corp.*, 1999 WL 893575, at *10 (Del. Ch. Oct. 13, 1999) (implying term requiring knowledge and intent by holding that preferred stockholders could prove an implied covenant breach if the board of directors, in an attempt "to frustrate the [preferred stockholders'] right to a liquidation

To construe the implied covenant in that way emphasizes that parties to a contract no longer operate from the same atomistic position that they did before contracting. By reaching a meeting of the minds and entering into a binding contract, they have joined together as counterparties to a shared undertaking. While they obviously are not fiduciaries and are free to act in their own interests, they have committed themselves to an effort to create joint surplus. For purposes of the implied covenant, that means that in the original bargaining position, the parties would have viewed a promise not to harm each other intentionally as so obvious that neither side would have raised it. It also means that if one side suggested that intentional harm would be acceptable, then the other would reject that idea immediately. Absent an idiosyncratic taste for masochism, the rational response to the question "After we enter into this contract, can I intentionally seek to harm you?" is a resounding "No." *Cf. ASB Allegiance Real Est. Fund v. Scion Breckenridge Managing Member, LLC*, 50 A.3d 434, 443 (Del. Ch. 2012) (discussing the implied covenant's prohibition on fraud under *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 443–44 (Del. 1996)), *rev'd on other grounds*, 68 A.3d 665 (Del. 2013).

Notably, the intent to harm intentionally—malice—goes beyond an intent to take self-interested action that happens to inflict consequential or collateral harm. It thus transcends situations involving efficient breach or the intentional failure to comply with a

---

preference . . . . intentionally embarked upon a course of action tantamount to a liquidation and did so in bad faith."), *aff'd*, 751 A.2d 878 (Del. 2000).

contractual obligation that gives rise to a claim for damages. The *Baldwin* decision suggests that malicious action can breach the implied covenant.

At present, Mona has pled facts and introduced evidence that could support a claim for breach of the implied covenant in that sense. His amalgamation of evidence suggests that the Purchaser made adjustments when preparing the November Balance Sheet that are so extreme as to indicate malice. The Independent Accountant must evaluate those adjustments in the first instance for purpose of the SPA Adjustment Provision. But the Independent Account is not empowered to decide whether there has been a breach of the implied covenant. That is an issue for the court to resolve, after the Independent Accountant has done its work, and with the benefit of the Independent Accountant's determinations.

## III.    CONCLUSION

Before this action can proceed, the parties must present their disputes to the Independent Accountant. This case is stayed pending the Independent Accountant's determinations. After the Independent Accountant has made its determinations, the parties may return to this court to address any remaining issues. Further litigation in this court will take into account the Independent Accountant's determinations.